IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE THOMAS D PHILIPSBORN IRREVOCABLE INSURANCE TRUST dated July 10, 2005, <br><br> Plaintiff <br><br> v. <br><br> AVON CAPITAL, LLC, and DONALD TRUDEAU, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

**COMPLAINT**

The Thomas D. Philipsborn Irrevocable Insurance Trust, dated July 10, 2005 (the "Philipsborn Trust" or the "Trust"), for its complaint against Avon Capital, LLC ("Avon") and Donald Trudeau ("Trudeau"), alleges as follows:

**I.   Nature of Action.**

1.   This action arises out of Avon and Trudeau contracting with and representing to the Philipsborn Trust that they would purchase three life insurance policies from the Trust, their taking possession of the life insurance policies and then refusing to pay all the money owed pursuant to the contract and representations. The policies insured the life of Thomas D. Philipsborn. One was issued by American General Life Insurance Company and pays a benefit of $5 million upon the death of Philipsborn (the "American General Policy"); a second was issued by Transamerica Occidental Life Insurance Company and pays a death benefit of $10 million (the "Transamerica Policy"); and a third was issued by AXA Equitable Life Insurance Company and pays a death benefit of $5 million (the "AXA Policy"). Avon and Trudeau (collectively "Defendants") agreed to pay $4,550,000 for these three policies. As purchasers,

Defendants would be entitled to designate the owner and beneficiary under the policies and designate the recipient of the death benefits. Based on the agreement and representations, the Philipsborn Trust relinquished and transferred the policies as directed by Defendants. To date, Avon and Trudeau have paid $3,731,487, but despite repeated demands have refused to pay the remaining $818,513. Under the terms of their agreements and based on the representations, Defendants are also liable to the Philipsborn Trust for the legal fees and costs of this action.

## II. Parties

2. The Thomas D. Philipsborn Irrevocable Insurance Trust dated July 10, 2005, is a trust created under Illinois law. At all relevant times, Andrew I. Philipsborn was the Trustee of the Philipsborn Trust and resided in the State of Illinois.

3. Defendant, Avon Capital, LLC ("Avon"), is a Connecticut limited liability company with its principal place of business in Connecticut and is a citizen of the State of Connecticut and all of its members are citizens of Delaware or Connecticut. Avon is in the business of buying and selling life insurance policies.

4. Ninety-nine percent (99%) of Avon is owned by Carpenter Financial Group, Inc. (hereafter, "CFG"), which is a corporation organized under the laws of Delaware and has its corporate headquarters and principal place of business in Connecticut.

5. CFG's corporate officers and directors direct, control and coordinate its business activities from its headquarters in Connecticut, have their offices in Connecticut, and meet in Connecticut.

6. The remaining one percent (1%) of Avon is owned by its managing member, Caroline Financial Group, Inc. (hereafter, "Caroline"), which is a corporation organized under the laws of Delaware and has its corporate headquarters and principal place of business in Connecticut.

7. Donald J. Trudeau is a resident of the State of Connecticut. At all relevant times, he was a member or manager of Avon and held himself out as Avon's agent.

### III. Jurisdiction and Venue

8. Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

### IV. Allegations Common to All Counts

10. The Philipsborn Trust owned three life insurance policies, each of which pay benefits upon the death of Thomas Philipsborn – the Transamerica Policy which pays a benefit of $10 million upon the death of Philipsborn, the American General Policy which pays a benefit of $5 million death benefit, and the AXA Policy which pays a death benefit of $5 million.

11. Avon and Trudeau agreed to acquire the three policies from the Philipsborn Trust and the Philipsborn Trust agreed and was induced to sell and transfer the policies as directed.

12. At the time of the transaction, the policies were being used as collateral by the Philipsborn Trust for loans from Coventry Capital, a subsidiary of LaSalle Bank. The transaction contemplated that Defendants would pay some of the purchase price directly to Coventry Capital to pay off the loan balances and some of the purchase price directly to the Philipsborn Trust. Thus, while the total purchase price promised for the three policies was $4.55 million, $3,044,837 was to be paid to Coventry Capital to pay off the loans and $1,505,163 was to be paid directly to the Philipsborn Trust. Defendants did not comply with these promises.

13. The agreement was not reflected in a single written document. Rather, Defendants made a series of written and oral promises and representations and the Philipsborn Trust agreed to and relied upon these promises and representations that if the Philipsborn Trust transferred the life insurance policies as directed, Defendants would pay for them. When representatives for the Philipsborn Trust expressed doubts and concerns, Defendants repeatedly reassured the Trust of the terms of the deal. Such promises and reassurances caused the Philipsborn Trust not only to ultimately transfer the life insurance policies to Defendants, but also to forgo other opportunities to sell the policies, and to decline to take its own steps to discharge the loans that were secured by the policies.

14. Avon and Trudeau's agreements and representations to pay for the policies, and the Philipsborn Trust's agreement and reliance resulting in the sale and transfer of the policies were reflected in a series of written documents exchanged between the parties. Collectively, these documents established an agreement the terms of which included the following:

 a. Defendants would pay a total of $4.55 million for the Transamerica, American General and AXA insurance policies;

 b. Of that $4.55 million, Defendants would pay $2,053,000 for the Transamerica Policy, $1,027,000 for the American General Policy and $1,470,000 for the AXA Policy.

 c. Defendants would discharge the loans secured by the policies from payments due the Philipsborn Trust and pay the balance to the Trust. Thus, on the AXA Policy, Defendants would pay $469,490 to Coventry to discharge the loan security by the AXA Policy and pay the Philipsborn Trust, $1,000,510;

d. In exchange for these payments, the Philipsborn Trust would transfer title to the insurance policies as directed and would execute any closing documents that it was instructed to execute; and

e. Defendants would indemnify the Philipsborn Trust as to actions that needed to be taken to complete the transaction and assure Defendants' compliance with the agreement, including but not limited to reimbursing the Trust for any legal fees incurred.

15. Defendants' agreement and representations that they would pay $4.55 million for the three policies, was reflected in documents, including but not limited to, the following:

a. On September 5, 2007, Defendants sent a letter to Thomas Philipsborn stating that Avon offered to pay $4.55 million to purchase the three life insurance policies. *See* **Exhibit A**.

b. On September 13, 2007, a broker and agent acting on behalf of Defendants, sent to representatives of the Philipsborn Trust an e-mail stating: "there is a **funded offer** on the table of $4.55MM for the three policies. You have received an offer letter indicating same. You have also received the closing documents for the two remaining policies that have come out of contestability and which the funder is ready, willing and able to close upon immediately." **Exhibit B**.

c. On November 9, 2007, representatives of the Philipsborn Trust sought a written commitment from Defendants that they would be "purchasing the following policies for the aggregate values shown below. . . .

| Carrier | Policy # | Loan Amount | Loan Maturity | Offer Price |
|---|---|---|---|---|
| Transamerica | 6012977 | 1,946,236.15 | 11/06/07 | 2,053,000 |
| American General | UM0039710L | 629,211.31 | 11/19/07 | 1,027,000 |
| AXA Equitable | 155224072 | 469,390.61 | 1/23/08 | 1,470,000" |

Exhibit C. Trudeau responded that while they would not make payment "without closing docs and a closed transaction, . . . I am happy to reiterate the overall commitment however." **Exhibit C**.

16. Defendants' agreement and representations that Avon and Trudeau had authority to pay and would pay for the policies was reflected in documents, including but not limited to the following:

   a. On September 19, 2007, after the Trust's representatives sought a written commitment signed by a managing member of Avon (*see* **Exhibit D**), Defendants sent the Philipsborn Trust a letter, which was virtually identical to the offer letter of September 5, 2007 (*see* Exhibit A), reflecting their intention to purchase the three policies for $4.55 million, signed by Trudeau as a "member" of Avon. **Exhibit E**.

   b. When the Philipsborn Trust requested a letter signed by a "Managing Member" of Avon as confirmation that Defendants would pay, on September 29, 2007, a broker and agent for Defendants forwarded to the Trust's representatives an e-mail communicating that "there is no 'managing member' in Avon. Only 'member.'" **Exhibit F**.

   c. On October 30, 2007, Trudeau wrote representatives of the Philipsborn Trust that the September 19, 2007 letter reflected Defendants' intent to purchase all three policies for $4.55 million. **Exhibit G**. The next day Trudeau wrote to representatives of the Trust "Please confirm that you have received the offer letter executed properly." **Exhibit H.**

   d. When in November 2007, the Trust's representatives again requested an "Officer commitment to Offer letter," they were told by Trudeau "I previously sent . . . a signed

letter" causing the trust to believe that the September 19, 2007 letter signed by Trudeau as "member" represented a binding commitment upon which it could rely. **Exhibit I.**

17. Defendants' agreement and representations that they would pay some of the purchase proceeds to Coventry to discharge loans secured by the policies and the remainder of the proceeds directly to the Philipsborn Trust was reflected in documents, including but not limited to the following:

a. On November 1, 2007, Trudeau wrote to the Trust's representatives "our concern is focused on completing the transaction. We expect to fund LaSalle [Coventry Capital] directly to pay off the loans . . . . I anticipate that that will happen Monday. I have a draft of the full procedure [as to the mechanics of the transaction] which as soon as everyone indicates it's okay I will release to you." **Exhibit J.**

b. On November 9, 2007, Trudeau wrote to representatives of the Philipsborn Trust, with a "simplified version" of the process by which the transaction would take place. In particular, the "process is as follows:

> 1. Loan will be paid off and policy will be owned and controlled through documents and then [insurance] carrier acknowledgement [of the change in ownership];
>
> 2. Avon will fund the difference between the debt [owed to Coventry] and acquisition directly as advised for the initial policy that has matured (Coventry and LaSalle have already been communicated with and Coventry has signed off on the form of escrow . . . .
>
> 3. The policies need to have complete paperwork to process the loan payoff and change of ownership . . . .
>
> . . . .
> Enclosed you will find all the documents required to be signed and notarized at closing for the above referenced insured." **Exhibit K.**

7

In other words, Defendants would pay Coventry the amounts necessary to discharge the loan and they would pay the Philipsborn Trust the difference between the amount to discharge the loan and the total acquisition price. Exhibit K.

c. When in or about November, 2007, the Trust received closing documents for the sale of the Transamerica Policy that did not mention the outstanding loans or that Defendants were going to pay off the loans, the Trust's representatives expressed concern because the closing documents contained a representation that the policies were being delivered with "'clean title' yet ALL KNOW THAT LaSalle or Coventry have an assignment or other lien against the policy." Trudeau replied: "Understood. LaSalle will provide a release as soon as they have loan paid off. All seller [the Trust] needs to do is execute the documents the rest is internal process." Exhibit I.

18. On information and belief, Defendants were funding in part the purchase of the policies through a deal they had made with an entity known as Financial Life Services. On information and belief, parts of the purchase price were also funded by Benistar Administrative Services, Inc. and its principal, Daniel Carpenter. On information and belief, under the Financial Life Services arrangement, Financial Life Services advanced Defendants the money to buy one or more of the policies and took as security title to the policies. If Defendants repaid the advances within the designated time, Financial Life Services was to transfer title of the policies back to Defendants. If Defendants failed to repay the advances, Financial Life Services would retain the policies. Regardless, Defendants agreed and represented to the Philipsborn Trust that it was Avon and Trudeau that were purchasing the policies from the Philipsborn Trust and that it was Avon and Trudeau that would pay the promised $4.55 million for them.

19. Avon and Trudeau affirmatively hid from the Philipsborn Trust the details of Financial Life Services role in the transaction. Thus, for example, when Defendants sent the Philipsborn Trust closing documents to effect the sale of Transamerica Policy, the materials included reference to Financial Life Services and a gross purchase price on the policy of $2 million rather that the agreed upon $2,053,000. Representatives of the Philipsborn Trust asked why the price was lower, but were told not to worry, "Purchase price is correctly stated in the documents that were forwarded. The total net purchase price payable to Mr. Philipsborn is $2,053,000. Sale is occurring in two steps. Step one is loan payoff [to Coventry] and that is being accomplished by purchase just above the loan payoff [of approximately $1.9 million]. Step two is full purchase. The difference between the two [approximately $108,000] we are paying simultaneously for the first policy. For the second policy [the American General Policy] it will be escrowed until change of ownership acknowledge (but otherwise the same process)." *See* Exhibit I. Undisclosed to the Trust was that the real reason the closing documents referenced a $2 million gross purchase price rather than $2,053,000 purchase price was because Defendants had entered into the transaction with Financial Life Services by which it would provide $2 million advance for Defendants to buy the policies and was taking title to the Transamerica Policy.

20. The same misleading conduct occurred in connection with the AXA Policy. In particular, the closing package for the AXA Policy also referenced Financial Life Services and the gross purchase price was not the promised $1,470,000 but $600,000. Representatives of the Trust wrote to Trudeau: "The purchase price again is incorrect as the total purchase price is $1,470,000. The note at maturity is $469,390. The purchase price that you sent is $600,000. Are you going to immediately wire the difference? Please advise. I will get the documents

signed . . . . I would like to understand as to why the purchase price has been off all three times?" Exhibit L. Trudeau replied: "The reason for the difference is that we aren't the owner when we fund these so what we are doing is paying off the loan (plus a little something for [the Trust] since that was requested) and then getting the change of ownership done with the carrier and then we pay balance." **Exhibit L**. Undisclosed to the Trust was that the real reason the closing documents referenced a $600,000 gross purchase price rather than $1,047,000 purchase price was because Defendants had entered into the transaction with Financial Life Services by which it would provide $600,000 advance for Defendants to buy the policies and was taking title to the policy. Defendants intentionally hid and failed to disclose to the Philipsborn Trust the full nature and extent of its transaction with Financial Life Services.

21. Based on the agreements and representations, the Philipsborn Trust returned to Defendants fully executed closing documents that transferred title to the insurance policies as directed. In particular, the Trustee for the Philipsborn Trust signed in blank forms to change the beneficiaries and owners of each policy, returned these forms to Defendants and essentially permitted Defendants to complete them and have beneficiaries and owners on each policy designated as they saw fit. Documents effecting transfer of the Transamerica Policy were executed on or about November 15, 2007. Documents effecting transfer of the American General Policy were executed on or about November 30, 2007. Documents effecting transfer of the AXA Policy were executed on or about December 18, 2007.

22. Defendants represented and agreed not only that they would pay all amounts due and owing but that Avon and Trudeau would indemnify the Philipsborn Trust for all of its costs associated with securing payment. On April 7, 2008, Trudeau wrote:

> "Tom
> I will have revised and have this placed on Avon letterhead.

10

>Please accept this as confirmation of our intent to complete funding of the AXA acquisition in total as contemplated and agreed upon previously. Further we agree to indemnify you as to any action we are taking to perfect that transaction. We expect full funding to occur within the next several days and we remain hopeful of an amicable outcome for all parties.
>
>We expect you to continue to cooperate in it's completion and tank you for you efforts to date.
>
>Sincerely,
>
>Don Trudeau
>Avon Capital, LLC"

**Exhibit M**.

23. Defendants have paid all sums due to the Philipsborn Trust on the Transamerica Policy and on the American General ("AG") Policy. However, they have paid only $182,097 on the AXA Policy, and despite repeated requests and demands, Defendants have failed and refused to pay $818,513 still due on that policy. The payments that Defendants made arrived by wire transfers in installments and were intended to assure, or had the effect of assuring the Philipsborn Trust, that Defendants were complying and were prepared to fully comply with their obligations. In particular, wire transfers were received on the following policies on the following dates:

| Date | Amount | Policy |
|---|---|---|
| 11/13/07 | $108,000 | Transamerica |
| 12/10/07 | $120,789 | American General |
| 02/25/08 | $122,000 | American General |
| 3/11/08 | $50,000 | American General |
| 3/13/08 | $105,000 | American General |
| 4/4/08 | $9,582.83 | American General |
| 4/4/08 | $116,278 | AXA |

11

     5/9/08                    $55,000                    AXA

Despite these payments, Defendants have failed and refused to pay the remaining amounts due and owing.

## COUNT I – BREACH OF CONTRACT
## AGAINST AVON AND TRUDEAU

24. The Philipsborn Trust realleges and incorporates by reference, as if set forth fully herein the allegations contained in paragraphs 1 through 23 above.

25. The documents exchanged between Avon and Trudeau and the Philipsborn Trust, described more fully in paragraphs 11 through 14 and 19, constituted and reflect a contract. The terms of that contract include:

    a. Defendants would pay a total of $4.55 million for the Transamerica, American General and AXA insurance policies;

    b. Of that $4.55 million, Defendants would pay $2,053,000 for the Transamerica Policy, $1,027,000 for the American General Policy and $1,470,000 for the AXA Policy.

    c. Defendants would discharge the loans secured by the policies from payments due the Philipsborn Trust and pay the balance to the Trust. Thus, on the AXA Policy, Defendants would pay $469,490 to Coventry to discharge the loan security by the AXA Policy and pay the Philipsborn Trust, $1,000,510;

    d. In exchange for these payments, the Philipsborn Trust would transfer title to the insurance policies as directed and would execute any closing documents that it was instructed to execute; and

e. Defendants would indemnify the Philipsborn Trust as to actions that needed to be taken to complete the transaction and assure Defendants' compliance with the agreement, including but not limited to reimbursing the trust for any legal fees incurred.

26. The Philipsborn Trust has fully performed each and every term of the contract, including transferring title to the insurance policies as directed and executing the closing documents that it was instructed to execute.

27. Avon and Trudeau have breached the contract by failing to pay $818,513 that they owe the Trust under the contract.

28. The Philipsborn Trust has been damaged by Defendants' failure to pay in the amount of $818,513.

29. Accordingly, by virtue of the forging, the Philipsborn Trust is entitled to compensatory damages of not less than $818,513, together with attorneys fees, costs and interest, and other relief as the Court deems just and proper.

### COUNT II – PROMISSORY ESTOPPEL
### AGAINST AVON AND TRUDEAU

30. The Philipsborn Trust realleges and incorporates by reference, as if set forth fully herein the allegations contained in paragraphs 1 through 23 above.

31. As reflected in paragraphs 14 through 17 and 22, Avon and Trudeau made an unambiguous promise to the Philipsborn Trust to pay a total of $4.55 million for the Transamerica Policy, the American General Policy and the AXA Policy to the Philipsborn Trust if the Philipsborn Trust would transfer title to the insurance policies as directed and would execute any closing documents that it was instructed to execute.

32. The Philipsborn Trust relied upon that promise when it transferred title to the insurance policies as directed and executed the closing documents that it was instructed to

execute. It also relied upon that promise when it did not pursue other opportunities to sell the policies, and declined to take its own steps to discharge the loans that were secured by the policies.

33. The Philipsborn Trust's reliance was expected and foreseeable by Avon and Trudeau.

34. The Philipsborn Trust relied on the promise to its detriment in that it has relinquished title to the policies and has not been paid all sums that are due and owning and has been deprived of valuable assets without compensation.

35. The Philipsborn Trust has been damaged by its reliance in the amount of not less than $818,513.

36. Accordingly, by virtue of the forging, the Philipsborn Trust is entitled to compensatory damages of not less than $818,513, together with attorneys fees, costs and interest, and other relief as the Court deems just and proper.

### COUNT III – UNJUST ENRICHMENT
### AGAINST AVON AND TRUDEAU

37. The Philipsborn Trust realleges and incorporates by reference, as if set forth fully herein the allegations contained in paragraphs 1 through 23 above.

38. The Philipsborn Trust relinquished title to the Transamerica, American General and AXA policies and transferred them as directed by Avon and Trudeau based upon the reasonable belief and expectation that Avon and Trudeau would pay the promised $4.55 million.

39. The Philipsborn Trusts relinquishment of and transfer of title to the policies as directed by Avon and Trudeau constitutes a benefit conferred on Avon and Trudeau which they aggressively sought and voluntarily accepted.

40. Avon and Trudeau wrongfully obtained title to the policies through their assertions and representations that they would pay $4.55 million for them, and have been unjustly enriched.

41. Retention of the policies by Avon and Trudeau would violate fundamental principles of justice, equity and good conscience.

42. Accordingly, by virtue of the foregoing, the Philipsborn Trust is entitled to compensatory damages, together with attorneys fees, interests and costs, and other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b) the Philipsborn Trust demands trial by jury.

Dated: May 16, 2011
    Chicago, Illinois

        THE THOMAS D. PHILIPSBORN IRREVOCABLE
        INSURANCE TRUST, DATED JULY 10, 2005


        By:   s/Leon Zelechowski
             One of its Attorneys

Leon Zelechowski, Esq.
LEON ZELECHOWSKI, LTD.
111 W. Washington Street
Suite 1051
Chicago, Illinois 60602
(312) 609-0022

15

Jonathan L. Marks
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street, Suite 1900
Chicago, Illinois
(312) 902-5200